# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**

**GREGORY D. CHISOLM**                    **NOS. 16-00033-BAJ-RLB**
                                        **17-00040-BAJ-RLB**
                                        **17-00048-BAJ-RLB**

## RULING AND ORDER

In January 2016, Defendant embarked on a robbery spree spanning nearly the entirety of Louisiana's Interstate 10 corridor, ultimately resulting in three separate federal indictments—one in each of Louisiana's three federal judicial districts. Ultimately, Defendant pleaded guilty to two counts of bank robbery, in violation of 18 U.S.C. § 2113(a) & (d), and one count of interference with commerce by robbery (Hobbs Act robbery) in violation of 18 U.S.C. § 1951. He was sentenced to three concurrent terms of 188 months imprisonment.

Now before the Court is Defendant's *pro se* **Motion Under 28 U.SC. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Case No. 16-cr-00033, Doc. 90, the "Petition")**, which, liberally construed, seeks to vacate his convictions and sentences due to his "mental illness." The Government opposes Defendant's Petition. (Doc. 93). For the following reasons, Defendant's Petition will be denied.

1

## I.    BACKGROUND

On January 4, 2016, Defendant walked into Whitney Bank's downtown New Orleans branch carrying a silver-colored object that was intended to look like a bomb. He approached the teller window and presented a handwritten note, which read: "BOMB explosive; give $20,000 dollars in all 100$ bills: NO mishaps on your part? No ink explosive packages? No press buttons to let anyone know? If so everyone blow up bomb in envelope dies suicide terrorism." As the teller complied with Defendant's demand—giving him $3,000 from her teller drawer—Defendant placed the silver object on the counter. Defendant then fled, at which point the bank and several other nearby businesses were evacuated until the FBI and the New Orleans Police Department arrived and determined that the silver object was not a bomb. (Case No. 17-cr-00040, Doc. 7 at p. 4).

One week later, on January 11, Defendant committed a similar heist at the J.P. Morgan Chase Bank branch on Government Street in Baton Rouge. Again, Defendant walked into the bank carrying a device that was intended to look like a bomb, approached the teller window, and presented a handwritten note. This note read: "Red Bag BOMB: Chill Don't try with fake mark money. No ink die explosive. No metal device. Bomb suicide—no press Buttons OR Floor Buttons—30: Double up Good, 30: Grand: $ Red Bag Thousand Dollars 30,000 mix $20's & 50's & 10s." Again, the teller promptly complied, giving Defendant $4,925 from her teller drawer. Defendant then placed the "bomb" on the counter and fled the scene, at which point the Bank was evacuated and nearby schools were placed on lockdown until the Baton

2

Rouge Police Department bomb squad arrived and neutralized the threat. (Case No. 16-cr-00033, Doc. 42 at pp. 6–7).

Defendant's luck ran out six days later, on January 17, when he attempted to rob the Coushatta Casino in Kinder, Louisiana (near Lake Charles). As before, Defendant entered the casino carrying an object intended to look like a bomb and presented a note to the cashier, stating "This is a bomb; give 15,000$, Kill Suicide Explosive." This time, however, the cashier did not immediately acquiesce, but instead triggered the silent alarm and summoned the manager. After about one minute Defendant grew anxious and attempted to leave the casino, at which point he was apprehended by security personnel and turned over to law enforcement. (Case No. 17-cr-00048, Doc. 7 at p. 5).

Defendant's January 11 robbery of the Baton Rouge Chase Bank resulted in an indictment returned in the Middle District of Louisiana on April 14, 2016, alleging one count of bank robbery by use of a dangerous weapon, in violation of 18 U.S.C. § 2113(a) & (d). (Case No. 16-cr-00033, Doc. 1). Defendant's attempted robbery of the Coushatta Casino resulted in a second indictment returned in the Western District of Louisiana on April 14, 2016, alleging one count of interference with commerce by robbery (Hobbs Act robbery), in violation of 18 U.S.C. § 1951. (Case No. 17-cr-00048, Doc. 1-3). Finally, Defendant's January 7 robbery of the New Orleans Whitney Bank resulted in a third indictment returned in the Eastern District of Louisiana on June 9, 2016, also alleging one count of bank robbery by use of a dangerous weapon, in violation of 18 U.S.C. § 2113(a) & (d). (Case No. 17-cr-00040, Doc. 1-2). Eventually,

Defendant consented to transferring his Western District case and his Eastern District case to this District for disposition. (*see* Case No. 17-cr-00040, Doc. 1; Case No. 17-cr-00048, Doc. 1).

Defendant's Chase Bank case—originally filed in this District—proceeded first. Relevant here, at the outset of the Chase Bank case, Defendant's court-appointed counsel moved for a competency evaluation to determine Defendant's "mental competency to stand trial [and] assist in the preparation of his defense." (Case No. 16-cr-00033, Doc. 15 ¶ 2). The Court granted Defendant's motion, ordering that Defendant be transferred to a federal medical facility so that a psychiatric examination could be performed, and a report prepared, to assist the Court's assessment of Defendant's competency. (Case No. 16-cr-00033, Doc. 19).

On October 5, 2016, forensic psychologist Chad Tillbrook, Ph.D., produced a 17-page report ultimately concluding that "there is no evidence to indicate Mr. Chisolm is currently suffering from a mental disorder or mental defect which would substantially impair his present ability to understand the nature and consequences of the court proceedings brought against him, or impair his ability to properly assist counsel in his defense." (Case No. 16-cr-00033, Doc. 31-2 at p. 19). Dr. Tillbrook observed that although Defendant demonstrated "cognitive limitations that likely place him in the borderline range of intellectual functioning," (*Id.* at p. 18), and suffered anxiety, depression, and anti-social tendencies (exacerbated by drug and alcohol use), (*Id.* at p. 14), "[t]here is no substantial support for [Defendant's] reports

of auditory and visual hallucinations and irrational, paranoid ideation," (*Id.* at p. 13).

Further, Defendant maintained:

- "adequate understanding of the charges and potential dispositions, as well as an understanding of the purpose of a trial," (*Id.* at p. 15);

- "good understanding of the roles of courtroom personnel," specifically including defense counsel, the prosecutor, the judge, and witnesses, (*Id.* at pp. 15–16);

- "an ability to discuss general risks and benefits" and to consult with his attorney and "arriv[e] at meaningful decisions," (*Id.* p. 17); *and*

- "an ability to meaningfully consider legal defense matters and weigh the potential risks that may arise in his case," (*Id.* at p. 18).

For good measure, Dr. Tillbrook further observed that Defendant "does not appear to have any attention or concentration difficulties that are likely to impair his ability to monitor the trial process, or follow the facts of the trial and witness testimony." (*Id.* at p. 19).

Defendant's sealed competency hearing commenced on December 2, 2016. Dr. Tillbrook appeared via live video link and provided testimony consistent with the conclusions set forth in his Report, stating that based on his evaluations he maintained no concerns regarding Defendant's ability to understand the nature of the proceedings against him, or to assist his defense. (Case No. 16-cr-00033, Doc. 88 at pp. 17–18).

After Dr. Tillbrook concluded his testimony, the Court engaged Defendant directly in a colloquy in which Defendant accurately recounted the charges against him and the basic nature of the competency hearing, and voiced complaints that Dr. Tillbrook's "exam was [not] all the way straight on me." (*Id.* at pp. 23–24). The Court

invited Defendant to expand, and Defendant explained his view that "he [Dr. Tillbrook] was like really like answering like the problem and the questions for me, like, making them correct, like not more like on my own." (*Id.* at p. 24). Based on these allegations, the Court adjourned and continued Defendant's competency hearing (without making a determination of Defendant's competency), to allow Defendant the opportunity to discuss his concerns with counsel. (*Id.* at pp. 24–28).

Defendant's competency hearing resumed on February 10, 2017. Again, Dr. Tillbrook appeared via live video link and answered questions from Defendant's counsel regarding Defendant's allegations that portions of his examination were "[not] all the way straight." Dr. Tillbrook testified that during the course of his examination he met with Defendant six times for a total of five hours, (Case No. 16-cr-00033, Doc. 83 at p. 10), that he (Dr. Tillbrook) personally "conducted all of the psychological testing," (*Id.* at p. 7), that Defendant performed all psychological tests "himself," (*Id.* at p. 9), and that he (Dr. Tillbrook) did not complete any tests on Defendant's behalf, (*Id.* at p. 8). Additionally, Dr. Tillbrook testified (in response to questions from the Court) that although Defendant tested within the borderline range of intellectual functioning, this was likely an "underestimate" given Defendant's "limited effort" and tendency to "disengage" during testing. (*Id.* at pp. 10–11).

Defendant did not offer any direct testimony to contradict Dr. Tillbrook's account. Instead, Defendant, through counsel, proffered a letter to the Court, which, in relevant part, outlined the purported basis of Defendant's allegations that Dr.

Tillbrook "made all papers and booklets look right answers [sic] himself." (*Id.* at p. 20). The Court allowed Defendant's counsel to read the relevant portions of Defendant's letter into the record, (*Id.*), and, further, admitted Defendant's letter itself as an exhibit, (*See* Case No. 16-cr-00033, Doc. 66-1).

Thereafter, the Court again questioned Defendant directly, inquiring whether he understood his "responsibility to work with [defense counsel] to defend you." (Case No. 16-cr-00033, Doc. 83 at p. 22). Defendant confirmed his understanding, and further confirmed that he understood the Court's role to "determine what evidence is presented against you should we go to trial on the case." (*Id.*). Finally, the Court entered its ruling, stating:

> I'm satisfied that I have all the evidence I need to enter a ruling in the case. In fact, I find by a preponderance of the evidence that Mr. Chisolm is competent to proceed to trial in this matter. I find that he's not suffering from a mental defect or a disease that would render him not capable of understanding the nature of these proceedings or to assist his attorney in adequately and competently defending him in this matter, and so, again, I find that Mr. Chisolm is competent to proceed to trial in this matter.

(Case No. 16-cr-00033, Doc. 83 at pp. 23–24).

On March 21, 2017, Defendant pleaded guilty as charged to the Chase Bank robbery. (Case No. 16-cr-00033, Doc. 43). Under the terms of Defendant's written plea agreement, Defendant expressly waived his right to appeal or collaterally attack his conviction and sentence in all but the following instances:

> The defendant, however, reserves the right to appeal the following: (a) any sentence which is in excess of the statutory maximum; (b) any sentence which is an upward departure pursuant to the Sentencing Guidelines; and (c) any non-Guidelines sentence or "variance" which is above the guidelines range calculated by the Court. Notwithstanding

this waiver of appeal and collateral remedies, the defendant may bring
any claim of ineffectiveness of counsel.

(Case No. 16-cr-00033, Doc. 42 at pp. 10–11). Defendant expressly confirmed
his understanding of this waiver at his rearraignment hearing. (Case No. 16-cr-
00033, Doc. 80 at pp. 27–29).

On June 23, 2017, Defendant pleaded guilty as charged to the Whitney Bank
robbery and to the Coushatta Casino attempted robbery. (Case No. 17-cr-00040, Doc.
12; Case No. 17-cr-00048, Doc. 12). And, again, Defendant's written plea agreements
for these offenses each included the same appeal waiver, reserving Defendant's right
to attack his convictions and sentences only in the limited instances set forth above.
(Case No. 17-cr-00040, Doc. 7 at pp. 9–10; Case No. 17-cr-00048, Doc. 12 at p. 9).

Defendant's convictions exposed him to statutory maximum terms of
imprisonment of 25 years for each of his bank robbery offenses, 18 U.S.C. § 2113(a)
and (d), and 20 years for his interference with commerce by robbery (Hobbs Act
robbery), 18 U.S.C. § 1951. On September 29, 2017, the U.S. Probation Office
produced a single presentence investigation report (PSR) outlining the Sentencing
Guidelines applicable to Defendant's offenses. Due to Defendant's prior Louisiana
convictions for aggravated burglary and aggravated battery, the PSR calculated
Defendant's offense level and criminal history category under the career offender
enhancement, U.S.S.G. § 4B1.1(a). (Case No. 16-cr-00033, Doc. 57 ¶¶ 64, 76). Based
on a total offense level of 31 and a criminal history category of VI, the PSR calculated
Defendant's guideline imprisonment range to be 188 months to 235 months. (*Id.* ¶¶
67, 76, 113). Defendant did not object to the PSR. (Case No. 16-cr-00033, Doc. 58).

8

On November 15, 2017, the Court conducted a combined sentencing hearing for each of Defendant's three cases, and sentenced Defendant to three *concurrent* Guidelines sentences of 188 months imprisonment, followed by *concurrent* terms of 5 years supervised release for each of Defendant's bank robbery offenses and 3 years supervised release for interference with commerce offense. (*See* Case No. 16-cr-00033, Doc. 61; Case No. 17-cr-00040, Doc. 21; Case No. 17-cr-00048, Doc. 18). At sentencing, the Court specifically noted that "Defendant's criminal history is lengthy and it's very, very serious," but also observed that Defendant "is a poster child for the failed mental health policies of the State." (*See* Case No. 16-cr-00033, Doc. 82 at pp. 16–19). On December 6, 2017, the Court entered its judgment in each of Defendant's three cases. (*See* Case No. 16-cr-00033, Doc. 63; Case No. 17-cr-00040, Doc. 23; Case No. 17-cr-00048, Doc. 20).

By rule, Defendant's deadline to timely appeal his convictions and sentences was 14 days after the Court rendered its judgments in his cases, or Wednesday, December 20, 2017. *See* Fed. R. App. P. 4(b)(1). Defendant missed this deadline. Nonetheless, on July 16, 2018, Defendant submitted a *pro se* document spanning 24 pages, indicating that Petitioner intended to "respectfully appeal." (*See* Case No. 16-cr-00033, Doc. 65 at 2; Case No. 17-cr-00040, Doc. 26 at 2; Case No. 17-cr-00048, Doc. 22 at p. 2). Defendant's signature page states that this document was submitted for mailing on July 9, 2018. (*See id.* at p. 22). This Court construed this document as a notice of appeal for purposes of each of his cases. (*See id.*).

On February 5, 2019, the Government responded to Defendant's notice of appeal by moving for dismissal in the United States Court of Appeals for the Fifth Circuit, on the basis that Defendant's appeal was untimely. One day later, Defendant's court-appointed appellate counsel responded on Petitioner's behalf, noting that she had conferred with Defendant and his trial counsel "to explore potential appeal issues," had "received no information from either [Defendant] or trial counsel to reasonably justify the untimely filing of the notice of appeal," and, on that basis, anticipated "filing a brief pursuant to the provisions of *Anders v. California*, 386 U.S. 738 (1967). Counsel further noted "that the issues [Defendant] wishes to raise are more appropriately brought forward in a proceeding under 28 U.S.C. § 2255 before the district court, rather than in a direct appeal," that she was "unable to present any factual or legal grounds for denying the Government's Motion to Dismiss the Appeal as Untimely." One week later, on February 12, the Fifth Circuit granted the Government's Motion and dismissed Defendant's appeal as untimely.

Finally, on or about October 4, 2019[1], Defendant submitted the instant Petition, thereby initiating these habeas proceedings pursuant to 28 U.S.C. § 2255. (Case No. 16-cr-00033, Doc. 90).[2] Even viewed under the most forgiving lens, the Petition contains no argument or authorities to support a recognizable habeas claim,

---

[1] Defendant is entitled to the benefit of the "prison mailbox rule," under which "a *pro se* prisoner's pleading is considered filed when the document is placed in the prison mailing system." *United States v. Duran*, 934 F.3d 407, 412 (5th Cir. 2019). The envelope containing Defendant's *pro se* Petition bears a prison mailroom stamp dated October 4, 2019. (Doc. 90 at p. 13).

[2] Defendant's Petition appears only in the docket of Case No. 16-cr-00033. Liberally construed however, it applies equally to Defendant's related cases, No. 17-cr-00040 and No. 17-cr-00048.

but instead requests the Court to "Please due [sic] away time sentence" based on Defendant's "[h]istory of mental illness," allegedly including "powerful depression," "symptoms-of-post-incarceration-syndrome," "social sensory deprivation syndrome," and "born special education." (*See generally id.*). The Government opposes Defendant's Petition. (Case No. 16-cr-00033, Doc. 93).

## II.    LAW AND ANALYSIS

### A. Standard

Section 2255 is designed to remedy constitutional errors and other injuries that could not be brought on direct appeal and would result in injustice if left unaddressed. *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). Specifically, the statute sets forth four grounds upon which relief may be granted: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); *see also Hill v. United States*, 368 U.S. 424, 426–27 (1962). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing." 28 U.S.C. § 2255(b).

A defendant seeking relief under Section 2255 must plead sufficient facts to establish a prima facie case of a constitutional violation. *United States v. Woods*, 870 F.2d 285, 287 (5th Cir. 1989). "[M]ere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *Id.* at 288 n.3.

11

Additionally, and importantly, the defendant must show "actual prejudice" resulting from a constitutional violation in order to warrant relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). "Actual prejudice" occurs when the constitutional error "had substantial and injurious effect or influence" on the outcome of the proceeding. *See id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Finally, relief under Section 2255 is subject to a one-year period of limitation, which, subject to three limited exceptions *not* applicable here, runs from the "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f). A conviction is final when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987). "The one-year limitations period is not jurisdictional and may be equitably tolled." *United States v. Martinez*, 596 F. App'x 333, 335 (5th Cir. 2015) (citing *Holland v. Florida*, 560 U.S. 631, 645–48 (2010)). Equitable tolling only applies, however, when the Petitioner "shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* (quoting *Holland*, 560 U.S. at 649). "Equitable tolling 'turns on the facts and circumstances of each particular case' and 'does not lend itself to bright-line rules.'" *United States v. Perkins*, 481 F. App'x 114, 117 (5th Cir. 2012) (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999)).

## B. Discussion

As set forth above, Defendant failed to timely appeal the December 6, 2017 judgment setting forth his conviction and sentence to the Fifth Circuit. As such, his conviction became final 14 days after it was entered, on December 20, 2017. Fed. R. App. P. 4(b)(1); *see Griffith*, 479 U.S. at 321 n.6. Defendant did not initiate these proceedings until October 4, 2019, well-beyond Section 2255(f)'s one-year limit. Accordingly, Defendant's Petition must be dismissed as untimely, *unless* Defendant shows that he is entitled to equitable tolling. *See Martinez,* 596 F. App'x at 335.

Defendant's Petition does not address the issue of timeliness or tolling. (*See* Doc. 90 at p. 11). Nonetheless, the Court will assume for present purposes that Defendant also intends to offer his alleged "mental illness" as an excuse for his delay, insofar as Defendant's underlying "claim" (such as it is) is based on his "history of mental illness." But even this assumption will not help Defendant because the Fifth Circuit has instructed that although "mental illness *may* toll AEDPA's statute of limitations, it does not do so as a matter of right." *Smith v. Kelly*, 301 F. App'x 375, 377 (5th Cir. 2008) (discussing cases). Rather, Defendant's alleged mental illness is merely a factor to consider within the broader analysis of whether Petitioner pursued his rights diligently but was thwarted from timely filing by "rare and exceptional circumstances." *See id.*

The record here provides no basis to establish either prong of the equitable tolling analysis. The Supreme Court has explained that "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize"

that he should act. *See Johnson v. United States*, 544 U.S. 295, 308 (2005). Here, the Fifth Circuit dismissed Defendant's untimely appeal in February 2019. The Fifth Circuit's dismissal alerted Defendant to the risks of unexcused delay, including that his legal claims could be barred. At this point—in February 2019—Defendant was in a position to realize that he should promptly act on any remaining claims he wished to pursue, yet Defendant waited nearly 10 months—until October 4, 2019—to submit his Petition. Absent any argument or evidence to the contrary, the Courts finds that Defendant has failed to show that he diligently pursued his rights.

Defendant also cannot show that his alleged mental illness, by itself, establishes extraordinary circumstances justifying equitable tolling. Although Defendant states he suffers from "powerful depression," "symptoms-of-post-incarceration-syndrome," "social sensory deprivation syndrome," and "born special education," he fails to explain how these conditions—individually or in combination with each other—prevented him from pursuing his legal rights. To the point, Defendant does not allege that, as a result of his mental illness(es), "he was forcibly confined or medicated, or deprived of access to legal materials, such that he 'simply could not pursue his legal rights during such a period.'" *Smith*, 301 F. App'x at 377–78 (quoting *Fisher*, 174 F.3d at 715). Having failed to offer any facts or argument explaining how his alleged mental illness has impacted his ability to pursue relief within AEDPA's limitations period, the Courts finds that Defendant has failed to show rare and exceptional circumstances warranting equitable tolling.

### III.    CERTIFICATE OF APPEALABILITY

Reasonable jurists would not debate the denial of Defendant's Petition, or the correctness of the Court's substantive rulings that Defendant has failed to make a substantial showing of the denial of a constitutional right. Accordingly, Defendant will be denied a certificate of appealability. *See United States v. Youngblood,* 116 F.3d 1113, 1115 (5th Cir. 1997).

### IV.    CONCLUSION

In sum, Defendant has failed to show that he is entitled to relief.

Accordingly,

**IT IS ORDERED** that **Defendant's Motion Under 28 U.SC. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Case No. 16-cr-00033, Doc. 90)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a copy of this Order shall be **ENTERED** in each of Defendant's three criminal cases, No. 16-cr-00033, No. 17-cr-00040, and No. 17-cr-00048.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that

Defendant's related action No. 3:19-cv-00724-BAJ be and is hereby **TERMINATED**

and **CLOSED** consistent with the denial of relief set forth herein.

Baton Rouge, Louisiana, this _22nd_ day of December, 2022

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

16